UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELIZABETH ANDERSON,            )
                               )
            Plaintiff,         )     Civil Action No.
                               )     11-10580-DPW
v.                             )
                               )
LOWELL HOUSING AUTHORITY,      )
GARY K. WALLACE, MARY ANN      )
MACIEJEWSKI, and BRIAN         )
WENCKUS,                       )
                               )
            Defendants.        )

MEMORANDUM AND ORDER
August 24, 2012

    This case centers on the termination, after a hearing, of a Section 8 voucher and the denial of the voucher recipient's request for reasonable accommodation.  Plaintiff Elizabeth Anderson, the voucher recipient, claims that Defendants the Lowell Housing Authority, Gary K. Wallace, and Mary Ann Maciejewski (the "Lowell Housing Authority Defendants" or "Defendants"[1]) violated her rights under the Due Process Clause of the Fourteenth Amendment, 24 CFR 982.555, the federal Fair Housing Act, and G.L. c. 151B, § 4.

    The Lowell Housing Authority Defendants have moved for

_____

    [1]  In the context of this memorandum, "Defendants" refers to Lowell Housing Authority, Gary K. Wallace, and Mary Ann Maciejewski.  The Complaint asserts separate state law claims against Defendant Brian Wenckus; those are not at issue in this motion for summary judgment.  I will remand the claims against Mr. Wenckus because the resolution of the federal claims against the Lowell Housing Authority Defendants causes me to conclude that the continued exercise of supplemental jurisdiction as to the claims against Wenckus would be improvident.

summary judgment.  While I conclude most of the claims against

the Defendants are not meritorious, I find one is.  The hearing

officer chose to conduct a post-hearing investigation and her

decision rested in part on the results of that investigation, as

to which the plaintiff was afforded neither notice nor an

opportunity to be heard.  Because of this core due process

violation, I will vacate the termination decision and order the

matter removed to the Lowell Housing Authority for a new hearing,

if the Housing Authority continues to pursue termination of

Anderson's Section 8 voucher, before a different hearing officer,

who is not one of the individual defendants in this case.

## I.   BACKGROUND[2]

### A.   *Factual Background*

The Lowell Housing Authority ("LHA") is a public housing

agency ("PHA") that administers the Section 8 Housing Choice

Voucher Program, funded by the Department of Housing and Urban

Development ("HUD"), for the Lowell, Massachusetts, area.

Elizabeth Anderson received Section 8 rental assistance from

---

[2]   Although Anderson has presented additional facts for
consideration for the purposes of summary judgment, she has not
responded to the Defendants' Statement of Undisputed Material
Facts (Dkt. No. 17).  Consequently, I deem the facts set forth in
the Defendants' Statement to be admitted by Anderson.  *See* Local
Rule 56.1 ("Material facts of record set forth in the statement
required to be served by the moving party will be deemed for
purposes of the motion to be admitted by opposing parties unless
controverted by the statement required to be served by opposing
parties.").

August 2002 until November 2010.  Her voucher was initially
issued by the Cambridge Housing Authority but came to be
administered by the LHA at some point during or prior to June,
2003.  On June 11, 2003, Anderson executed a lease, titled "Model
SECTION 8 VOUCHER LEASE," for a three bedroom unit at 39 Wilder
Road in Lowell, Massachusetts.

### 1.    Unauthorized Occupant

At her deposition, Anderson testified that she and Brian
Wenckus, her landlord at the 39 Wilder Road apartment, dated a
few times in 2002, a few times in 2003, and for some months in
2004.  She stated that the relationship was "on and off again
until 2008" and ended in approximately the late summer of 2008.
Anderson testified that after the relationship ended, Wenckus
would still let himself into her house.  A few times, he would
open up the shower curtain while Anderson was showering, although
she told him that it was no longer appropriate.

In the fall of 2009, Wenckus lost his job and his home, and
in November, he asked Anderson if he could stay with her for a
few days until he could decide where to go.  Anderson told him
that a stay of a few days would be fine.  She testified that it
was her understanding that he could stay in the unit without
causing her to violate the LHA's rules because he would not
exceed the two week limit for guest stays.  The LHA's
Administrative Plan, which sets forth the procedures for the

administration of its Housing Choice Voucher Program, states that "[a] guest can remain in the assisted unit no longer than 14 consecutive days or a total of 20 cumulative calendar days during any 12 month period."  At her deposition, Anderson testified that at the time she received her voucher, she understood that no one other than herself and her children was allowed to reside in her rental unit for a longer period without permission from the housing authority administering the voucher.

When asked if she was afraid of Wenckus in November, 2009, Anderson testified that Wenckus made comments "that he could just move [her] stuff out and take over the apartment," and that at the time she believed that he could do so and was "afraid that he was going to change the locks and put all [her] belongings out on the street . . . ."  She acknowledged that during that time period, she was not "desperate, desperately afraid of him" and was not afraid that Wenckus would become violent towards her.

Anderson testified that two days after Thanksgiving, she asked Wenckus to leave.  She said that he had "caused a scene" at Thanksgiving, yelling at her sons, and further, she was concerned that if he stayed she would get in trouble.  At that point, he had already overstayed the two week guest limitation.  Wenckus told her that he did not have to leave because he owned the house.

Anderson testified that she did not tell the LHA in November, 2009, that Wenckus was staying in her apartment and would not leave because:

> I was trying to get him out on my own.  And I was afraid that I, that he was going to put my belongings out on the street if I had gone to them.  I was also afraid I could get in trouble.  And afraid of being homeless.

She testified that during December, 2009, she had at least three more conversations in which she asked Wenckus to leave.  She stated that he remained at the apartment until May, 2010.

Anderson testified that in April, 2010, Wenckus became physically violent with her.  She stated:

> I was getting very frustrated that he was still there.  He was questioning my kids on my whereabouts, if I didn't come home right after work.  He was stalking.  He was very rude to my friends.  I asked him to leave on that day in April, I can't remember which day, and he wouldn't leave.  And I starting chucking all of his belongings out of the basement bulkhead, and he came at me, and he raised his fist. [He did not hit me, but] he grabbed me and he raised his fist.

In May, 2010, he was again violent with her.  Anderson stated:

> That incident, he wanted me to pay my rent.  I gave him my check, with the three quarter amount of payment, and he told me he was putting my belongings out on the street.  He was verbally abusive, calling me a bitch, calling me all kinds of four letter names.  And he told me that my stuff would be out on the street [the] next day.  And I told him that he was leaving.  And he said no.  And I told him that I was going to call the police . . . . And he got right up in my face and started screaming, like nose to nose, about what a horrible person I was.  Then he started to take things.  He took the coffee maker off the counter.  And I took it and put it out in his truck.  And then he ripped the TV from out in front of the kids.  I had my youngest son, James, and his friends were watching TV.  He ripped the TV out from the wall and I--he pushed me before that, he pushed me in the kitchen with the coffee maker.  And he ripped the TV out.

And I said, "Fine, take the TV[,"] and I pushed him out the
door with the TV, because it was one of those big TVs.  And
I pushed him out the door, and I closed and locked the door.
And he came in through the bulkhead and started pushing me
and shoving me some more.  And I got him out of the house
again.  And I had my oldest son, Ricky, run downstairs and
lock the bulkhead, and he started smashing and screaming on
it . . . . My youngest son had ran out of the house.  He had
gone out of the house with his friend who lived up the
street.  Brian chased him up the street, yelling at him,
"Your mother is nothing but a cunt bag."  Then he started
screaming at the front door again, and he ripped the whole
screen door out of the frame.  The whole frame came loose.

Anderson testified that at this point she called her boss, an
Assistant District Attorney, and said, "I don't know what to do.
I'm really embarrassed, but this is what is going on."  Her boss
then called the police, who responded to the call and completed a
police report.  Anderson testified that in May, 2010, a
restraining order was issued against Wenckus.

> ### 2.   Subsidy Termination Process

Anderson testified that in July, 2010, her case worker from
the LHA called her to tell her that Wenckus had reported that
Anderson was not paying rent and to ask her why she was not
paying.  Anderson told her case worker that Wenckus had moved in
and taken over a room and that she could not get him out, and
further that she wanted to move.  At the case worker's request,
Anderson submitted copies of the restraining order and the police
report from the May, 2010, incident.

Anderson testified that when she went to the LHA for her re-
evaluation in September, 2010, Arlene McDermott of the LHA told

Anderson that McDermott would take her to court for fraud and that she was recommending that the LHA terminate Anderson's voucher.  Anderson testified that she understood that the termination was because she had someone unauthorized in her home.  Anderson told McDermott that she did not allow Wenckus to remain; instead, he refused to leave.

### i.  Notice

In a letter dated September 30, 2010, Tha Chhan, Director of the Division of Leased Housing at the LHA, informed Anderson that, as she had discussed with Arlene McDermott, "there are serious concerns relative to your ex-boyfriend/Landlord, Mr. Brian Wenckus, who has been residing at 39 Wilder Road, Lowell, MA as confirmed by the Lowell Police report dated May 12, 2010." The letter stated:

> As stated in the report, you allowed Mr. Wenckus to stay with you in the unit.  As a result, you are in violation of the Family Obligations of the Housing Choice Voucher, Section 4B, paragraph 7, which states that the tenant agreed to "use the assisted unit for residence by the family.  The unit must be the family's only residence."  I have no choice but to terminate your Section 8 Rental Assistance effective October 31, 2010 . . . . If you wish to appeal this decision, you may do so by sending a written request for a hearing within 10 days of this notice (on or before October 15, 2010) to: Gary K. Wallace, Executive Director, P.O. Box 60, 350 Moody Street, Lowell, MA 01853-0060.

In a letter dated October 4, 2010, Anderson wrote to request a hearing, stating that "the police report alone does not accurately describe the situation" and that she "would like the opportunity to address the inconsistencies in the police report."

7

### ii.  Maciejewski's Pre-hearing Discussions

Mary Ann Maciejewski served as the hearing officer at Anderson's termination hearing.  At the time, she was the Executive Administrator of the LHA.  Her duties included overseeing the property managers and the Section 8 Department of the Leased Housing Division of the LHA.

Prior to the termination hearing, Maciejewski spoke with Tha Chhan, the Director of Leased Housing.  She testified that as the hearing officer she would normally speak to the Director of Leased Housing prior to a termination hearing.  During their conversation, Chhan told Maciejewski that Anderson was being terminated because she had allowed her landlord to stay with her for a period of nine months.  He told Maciejewski that Traci Carbonneau, an inspector at the LHA, had noticed that the relationship between Anderson and Wenckus was not a typical landlord-tenant relationship.[3]  Maciejewski stated that after speaking with Chhan, she determined that Carbonneau should probably attend the hearing.

Maciejewski then spoke with Carbonneau and asked Carbonneau what she had seen.  Carbonneau reported that while inspecting the apartment, she had seen Wenckus putting in a new bathroom. Carbonneau had told Anderson she was very fortunate to have a

---

[3]  At her deposition, Maciejewski acknowledged that there were no rules prohibiting relationships between landlords and tenants in the Housing Choice Voucher Program.

landlord who would install a second bathroom.  Anderson had turned to Wenckus and winked at him, saying, "I'll keep him." Carbonneau also told Maciejewski that during another inspection, she noticed a large hole in the rear deck, and Anderson told her that Wenckus was allowing her to install a hot tub.  Maciejewski testified that she concluded that Carbonneau's input would be useful at the hearing.

Gary Wallace, the Executive Director of the LHA, testified at his deposition that he met with Maciejewski and Chhan to discuss Anderson prior to the hearing.  Maciejewski informed him that the case was brought to her by Chhan and two of his administrative aides and that Anderson appeared to be allowing an unauthorized occupant, her landlord, to reside in her apartment. Wallace believed that the case was "unusual" because the alleged unauthorized occupant was the landlord.  He testified that he and Maciejewski felt that if the landlord had resided at the apartment, they should report the issue to HUD and to the Inspector General.  Wallace stated that he might have spoken to Maciejewski about Anderson a second time before the hearing, but he was not sure.

### iii. Hearing

Anderson retained Attorney David Brown of Merrimack Valley Legal Services to represent her at the October 14, 2010, pre-termination hearing.  She and Brown were present at the hearing.

Also present at the hearing were Moriah Brown (an intern at

Merrimack Valley Legal Services), Traci Charbonneau, Arlene

McDermott, and Mary Ann Maciejewsi.

At her deposition, Anderson testified that at the hearing,

her attorney stated that she suffered from Post-Traumatic Stress

Disorder ("PTSD").  She stated that the focus of the hearing,

however, was the fraud allegation and her relationship with

Wenckus.  She testified:

> It was a screaming match.  It was not a hearing.  It was
> basically everybody yelling over the top of everybody
> else . . . . David was yelling that they were not listening
> to what we were really here for, and about, about what had
> gone on.  They were yelling about me committing fraud.  They
> didn't believe that I had PTSD, that I was too high
> functioning.  It was a cat fight, a cat fight in front of
> me.  And I sat with my head down and cried . . . . I didn't
> have a chance to present that Brian had threatened to throw
> my belongings out in the street.  Brian would come into my
> home unannounced at any time.  That he told me that he owned
> the house and everything in it . . . . They didn't let me
> present the fact that I had a really bad relationship before
> and I didn't know how to get him out.  I didn't have the
> tools to get him out.  They did not listen to me.

Anderson testified that Maciejewski did not act as an impartial

hearing officer because she "was accusatory, instead of sitting

and listening to the facts and letting everyone have their

chance."

At her deposition, Maciejewski testified that at the

hearing:

> David Brown indicated that Ms. Anderson had--Ms. Anderson
> had been involved in a situation where she had her landlord
> move in.  He had indicated that he was going to just first
> leave his tools in the basement and then he, in fact, came

in for a two-week period and then, beyond that, never left. And that--that she was powerless to remove him from the premises because she was in fear of losing her home.

Maciejewski testified that thereafter:

M[o]riah Nelson provided information relative to Post-Traumatic Stress Disorder--an overview of how it can affect an individual especially in this situation because Ms. Anderson did suffer from Post-Traumatic Stress Disorder that was a result of a previous abusive relationship with her former husband, Richard Anderson.

Maciejewski also testified that Nelson presented a letter from

Dr. Vaccaro, Anderson's doctor.  The letter stated:

This is to state that I am the Primary Care Provider of Elizabeth Anderson and she has been known to me for 8 years. She is compliant with medical care, has a history of Domestic Violence and Post Traumatic Stress Disorder.  She also has had recent stressors and Mental Health issues for which she is actively pursuing counsel[]ing and mental health treatment.  Please allow her to keep her current housing arrangements.  I appreciate your help in this matter.
Sincerely,
Carla Vaccaro M.D.

Maciejewski testified that after Nelson spoke, Charbonneau

described the observations (previously discussed with

Maciejewski) that she had made during inspections of the

apartment.  Anderson indicated that Wenckus had installed a

bathroom in the basement for the next door neighbor as well.

Arlene McDermott then described her conversations with Ms.

Anderson.  Anderson indicated that the information in the police

report was not accurate and that she had told McDermott about the

inaccuracy

11

Maciejewski testified that at that point she asked Anderson to tell her why she thought her voucher should not be terminated. Anderson told her that she could not get Wenckus to leave the apartment and that he had threatened to put all of her belongings on the street.  Anderson began to cry.

### iv. Reasonable Accommodation Request

Maciejewski testified that after the hearing, Attorney Brown called her and indicated that he would be submitting a letter requesting a reasonable accommodation for Anderson's PTSD.  The following day, he submitted a letter stating that he was "submitting a formal request for reasonable accommodation on behalf of Ms. Anderson."  In the letter, Brown stated that Anderson "suffer[ed] from disabilities including Post Traumatic Stress Disorder, anxiety and depression" because of the domestic violence she suffered at the hands of her ex-husband.  He stated that it was "not at all uncommon for victims of domestic violence to suffer from PTSD, a disorder which like many other mental illnesses, may cause its suffers to act in ways others might either consider irrational, or abnormal for someone that otherwise appears intelligent and put together."  He explained that Anderson was "paralyzed by fear that another person might see as unreasonable, but which to her was rational self-preservation."

Brown stated that Anderson suffered from a disability that caused the alleged non-compliance and was entitled to a reasonable accommodation.  He requested that she be accommodated by being allowed to keep her voucher.  He noted that she would "agree to attend therapy as often as recommended by a licensed counselor.  One of the explicit goals of this therapy would be to teach Ms. Anderson effective tools for overcoming her fears when she becomes overwhelmed."

Enclosed with the letter were a number of additional documents.  Brown included a brief description of PTSD, with a list of three citations to reference materials.  He included an affidavit signed by Anderson in 2003 describing the abuse that she had suffered at the hands of her ex-husband, who threw her down a flight of stairs while she was pregnant, hit her many times (including once with a hair-dryer), ran his van into her car while she was in the car, threatened her with deportation, controlled all household finances, and did not allow her to have any friends.  In the affidavit, Anderson stated that she was seeking counseling.  Brown also included a letter from Assistant District Attorney Thomas O'Reilly, Anderson's boss, recommending Anderson for United States Citizenship and praising her as "trustworthy, reliable, dependable, loyal, moral, honest, [and] discreet . . . ."  Finally, Brown included copies of rent checks sent by Anderson from August, 2009, until May, 2010.

At her deposition, Maciejewski testified that she "had never been provided with information relative to [Anderson's] disability" and "had nothing to determine that [Anderson] was disabled" because Brown "did not provide any letter from any third party who would have been qualified to make a determination that Ms. Anderson is, in fact, disabled based on her condition of Post-Traumatic Stress Disorder." She explained that "[t]he letter that Ms. Vaccaro provided indicated that [Anderson] did suffer from a condition but it did not go on to say that she was disabled or based on the condition that she--you know, that she was disabled." She did not communicate this to Brown, and testified that she "thought that if there was a letter that would be forthcoming or a letter attached indicating that [Anderson] was disabled that it would have all been done at that time."

### v.  Maciejewski's Post-Hearing Discussions

Wallace testified that he spoke with Maciejewski about the Anderson hearing days after it had occurred.  Maciejewski told him that Anderson had clearly violated the contract and allowed an unauthorized occupant to reside at the apartment for nine months and that, as a result, Maciejewski would terminate the voucher.  He stated that Maciejewski took the letter from Anderson's doctor into consideration "but felt that there were a number of other circumstances that it didn't appear that that, you know, prevented her from still adhering to her lease as she

should have." He stated that Maciejewski "acknowledged that it was a condition but that she felt that there were other factors and enough other information that the client could have lived up to her contract and did not."

Wallace testified that Maciejewski later received a phone call from Attorney Brown that he would be providing her with more information and would be seeking a reasonable accommodation. Wallace testified that he told Maciejewski to see what information Brown provided. Maciejewski received the packet of information and "expressed her feelings that--still that this person had the ability to honor the lease and should have upheld her contract and that she still felt that it should be terminated." She told him that the factors that led her to that conclusion were "[t]he testimony from the two staff persons and apparently a letter that was provided by Merrimack Valley Legal Services that talked about the abilities and capabilities of Ms. Anderson which would lead one to believe that she could function at a high level and was, in fact, surrounded by enough support that if she wanted to reach out and get help or felt that she was disabled by this that she had a lot of opportunity and resources around her to do so and that she didn't."

### vi.  Written Decision

In a letter dated November 16, 2010, Maciejewski denied the reasonable accommodation request. The letter presented

Maciejewski's summary of the evidence.  Maciejewski then stated
that "[i]n assessing all the information presented," she offered
three observations: (1) Anderson had requested that Mr. Wenckus
reduce her rent, "so it would appear that [Anderson was] trying
to pay less than the amount program rules dictate;"
(2) Anderson's employer, the District Attorney's office, offers
services for victims of domestic violence that she stated she did
not want to access because she was embarrassed, but she did seek
assistance from coworkers when she wanted to change the police
report; and (3) Anderson allowed an unauthorized person to live
with her knowing that it was a violation of her family
obligations under the voucher contract, and this was especially
egregious because the unauthorized occupant was her landlord.

    Maciejewski then noted that the checks sent by Attorney
Brown "show [Anderson's] name with an address of 1390 A Main
Street, Tewksbury, MA" and that "[o]ne of the checks [was] made
out to the Town of Tewksbury with a notation of a registration
number at the bottom of the check."  Maciejewski stated:

> I have been able to verify that your car is actually
> registered to the Tewskbury address.  It would appear that
> you have falsified your residence in Tewskbury for the
> purpose of registering your automobile outside of the city
> of Lowell.  Lastly, the rent checks presented for the nine
> month period total $5,572.75 when your actual rent payments
> should have totaled $6,111.

Maciejewski also noted that Attorney Brown had provided (1) a
description of PTSD as "a condition that poses a significant

impact on social, occupational and other areas of day-to-day functioning and decision making" and (2) a letter from Assistant District Attorney O'Reilly describing Anderson as a hard worker and reliable employee.

Maciejewski concluded that "[b]ased on all of the information presented, [she was] unable to authorize a reasonable accommodation request to allow [Anderson] to remain on the program." She explained that "[t]he reason for this determination is that there appears to be a clear pattern of deception which has been evident throughout this case."

### 3. Anderson's Mental Health History

At her deposition, Anderson testified about her mental health. She first sought mental health counseling in 2002 because of the effects of a long-term abusive relationship with her ex-husband. In 2002, she suffered from anxiety, panic attacks, sleeplessness, nightmares, and some depression. When asked how her symptoms affected her life, Anderson testified that she drank, was depressed, and took medication, and that "[i]t was just all around . . . I, basically, at that time, I just functioned. I just functioned the best that I could." She testified that she "still got things done that needed to get done." She stated that in 2002 she was employed, and her symptoms did not cause her to miss work.

Anderson testified that her symptoms subsequently improved.
She estimated that she stopped seeing a counselor in 2004,
although she continued to call her counselor when she "had bad
days."   She stated that she was off of medications for a long
time, approximately between 2003 and 2010.

Anderson testified that in 2009 she was not suffering from
the anxiety, the panic attacks, the sleeplessness, the
nightmares, or the depression.   However, things started to worsen
that year.   She "was almost paralyzed by fear."   She stated:

> I couldn't function, as far as sitting down to write out my
> bills.   To focus, I've had a really, really hard time
> focusing . . . . With [Wenckus] lurking around, and coming
> around whenever he wanted to.   I felt like I had to hide my
> checkbooks, and what I was paying out and what I was
> bringing in, and I just had to keep everything a secret from
> him.

She stated that in 2009 she did not miss work due to her
symptoms.   When asked to describe other negative affects on her
life, she stated that "often [she] was kind of grumpy at work
during 2009."   She testified that nonetheless she got her work
done, and that work was a "refuge a lot of times, to what was
going on at home."   When asked if there was anything else that
she could not do in 2009, that she thought she had to do, she
shook her head.

Anderson testified that in 2010 things changed.   She stated:

> I started having anxiety attacks.   The depression got really
> bad, where I would come home from work and just go straight
> to bed.   I didn't cook a lot.   I tried to do what I could
> do.   My boys kind of stepped up and did more.   I didn't

clean.   I didn't really have any motivation to do anything.
Anderson stated that the symptoms became "most severe after the
hearing" in October, 2010, when she was "facing being homeless,
the fear of Brian and retaliation."   She stated that in 2010 she
started seeing a new counselor.

### B.   Procedural Background

On March 4, 2011, Anderson filed this case in the Northeast
Division of the Massachusetts Housing Court.   She brought seven
claims for relief against the LHA, Wallace, and/or Maciejewski.

Through the first five counts, Anderson seeks a remedy
pursuant to 42 U.S.C. § 1983.   In Count I, she asserts that the
Defendants violated her right to adequate pre-hearing notice
pursuant to 24 C.F.R. 982.555(a)(1)(v) and the Due Process
Clause, as secured by 42 U.S.C. § 1983.   In Count II, she asserts
that the Defendants violated her right to an impartial hearing
officer pursuant to 24 C.F.R. 982.555(e) and the Due Process
Clause, as secured by 42 U.S.C. § 1983.   In Count III, she
asserts that the Defendants violated her rights pursuant to 24
C.F.R. 982.555(e) and the Due Process Clause, as secured by 42
U.S.C. § 1983, by conducting the hearing without a first-hand
witness of the incidents leading to the termination.   In Count
IV, she asserts that the Defendants violated her right to an
adequate post-hearing written decision pursuant to 24 C.F.R.
982.555(e)(6) and the Due Process Clause, as secured by 42 U.S.C.

§ 1983.   In Count V, she asserts that the Defendants terminated

her voucher in an arbitrary and capricious manner in violation of

her rights under Due Process Clause, as secured by 42 U.S.C.

§ 1983.

In two additional counts, Anderson asserts that the LHA

illegally discriminated against her on the basis of disability.

In Count VI, she asserts that the LHA violated the Fair Housing

Act ("the FHA") by refusing her a reasonable accommodation and by

making statements indicating a preference, limitation, or

discrimination (or an intention to make such a preference,

limitation, or discrimination) based on disability.   In Count

VII, she asserts that the LHA violated G.L. c. 151B, § 4(7A) and

(7B), by refusing her a reasonable accommodation and by making

statements with respect to the rental of a covered housing

accommodation that indicated a preference, limitation, or

discrimination (or an intention to make such a preference,

limitation, or discrimination) based on disability.

On April 6, 2011, the Defendants removed the case to this

Court.   On May 7, 2012, they filed for summary judgment.   The

Defendants contend that they are entitled to judgment as a matter

of law on all counts.

## II.   STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant

shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence about
the fact is such that a reasonable jury could resolve the point
in the favor of the non-moving party.  A fact is 'material' if it
has the potential of determining the outcome of the litigation."
*Baker v. St. Paul Travelers Ins. Co.*, 670 F.3d 119, 125 (1st Cir.
2012) (quoting *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77
(1st Cir. 2009)).

Anderson "may defeat a summary judgment motion by
demonstrating, through submissions of evidentiary quality, that a
trialworthy issue persists." *Rockwood v. SKF USA Inc.*, No. 11-
1105, 2012 WL 2437685, at *7, -- F.3d --, (1st Cir. June 28,
2012) (quoting *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st
Cir. 2006)).  She "must be able to point to specific, competent
evidence to support [her] claim." *Id.* (quoting *Soto-Ocasio v.
Fed. Express Corp.*, 150 F.3d 14, 18 (1st Cir. 1998)).  In
evaluating this evidence, I must construe the record in the light
most favorable to Anderson, resolving all reasonable inferences
in her favor while ignoring conclusory allegations, improbable
inferences, and unsupported speculation.  *Collins v. Univ. of
N.H.*, 664 F.3d 8, 14 (1st Cir. 2011).

### III.  ANALYSIS

### A.  § 1983 Claims

In *Goldberg v. Kelly*, the Supreme Court held that a

proceeding to terminate public assistance must meet the following criteria in order to satisfy the requirements of procedural due process: (1) "timely and adequate notice detailing the reasons for a proposed termination," (2) the opportunity to appear at a pre-termination hearing, to present evidence, and to confront and cross-examine witnesses, (3) leave to be represented by counsel at the hearing, (4) a post-hearing decision that "rest[s] solely on the legal rules and evidence adduced at the hearing" and demonstrates compliance by "stat[ing] the reasons for [the] determination and indicat[ing] the evidence [the decisionmaker relied on," and (5) an impartial decisionmaker. *Goldberg*, 397 U.S. 254, 266-71 (1970).  "The Supreme Court reasoned that the interests of the recipient in the uninterrupted provision of benefits and of the State in not wrongly terminating benefits outweighed the State's competing interest in summary adjudication.  This reasoning applies with equal force to public housing assistance provided pursuant to Section 8, where eligible participants rely on subsidies to meet their basic need for housing." *Basco v. Machin*, 514 F.3d 1177, 1182 n.7 (11th Cir. 2008) (internal citation omitted).  Consequently, courts have uniformly recognized that the *Goldberg* due process requirements apply in the context of subsidized housing benefits.  *See Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 184 (6th Cir. 1984) (collecting cases).

The United States Housing Act essentially codifies the *Goldberg* criteria for hearings with respect to low-income housing benefits.  It requires HUD regulations to mandate that each PHA will utilize a grievance procedure under which tenants shall:

**(1)** be advised of the specific grounds of any proposed adverse public housing agency action;
**(2)** have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (l) of this section;
**(3)** have an opportunity to examine any documents or records or regulations related to the proposed action;
**(4)** be entitled to be represented by another person of their choice at any hearing;
**(5)** be entitled to ask questions of witnesses and have others make statements on their behalf; and
**(6)** be entitled to receive a written decision by the public housing agency on the proposed action.

42 U.S.C.A. § 1437d(k).

The corresponding HUD regulations require PHAs to give program participants an opportunity for an informal hearing with respect to decisions to terminate assistance.  24 C.F.R. § 982.555(a)(1)(v).  The PHA must provide "prompt written notice" that the tenant may request a hearing, and the notice must: "(i) Contain a brief statement of reasons for the decision, (ii) State that if the family does not agree with the decision, the family may request an informal hearing on the decision, and (iii) State the deadline for the family to request an informal hearing." *Id.* § 982.555(c)(2).  When a hearing is requested, "the PHA must proceed with a hearing in a reasonably expeditious manner . . . ." *Id.* § 982.555(d).  Prior to the hearing, a

participant must be given the opportunity to examine and copy any PHA documents that are directly relevant to the hearing. *Id.* § 982.555(e)(2)(i).

At the hearing, a participant has the right to be represented by a lawyer at her own expense. *Id.* § 982.555(e)(3). The hearing "may be conducted by a person or persons designated by the PHA, other than a person who made or approved the decision under review or a subordinate of this person." *Id.* § 982.555(e)(4)(i). Both the PHA and the participant must be given the opportunity to present evidence and to question any witnesses. *Id.* § 982.555(e)(5). The hearing officer may consider evidence without regard to admissibility under the rules of evidence applicable to judicial proceedings. *Id.*

After the hearing, the hearing officer "must issue a written decision, stating briefly the reasons for the decision." *Id.* § 982.555(e)(6). "Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing." *Id.* A copy of the decision must be furnished promptly to the participant. *Id.*

Anderson's § 1983 claims are based on the above constitutional and regulatory rights. She seeks to privately enforce both her due process rights under *Goldberg* and her regulatory rights pursuant to 24 C.F.R. § 982.555. The

Defendants do not dispute that a violation of such rights is actionable under § 1983. *See West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.); *Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 621 (6th Cir. 2005) (analyzing Section 8 voucher recipient's § 1983 claim for violation of due process rights); *Davis*, 751 F.2d at 182-84 (same); *Gammons v. Mass. Dep't. of Hous.*, 523 F. Supp. 2d 76, 81-84 (D. Mass. 2007) (discussing at length and concluding that "tenants have an enforceable right under § 1983 not to have their Section 8 benefits improperly terminated in contravention of HUD regulations."); *Fields v. Omaha Hous. Auth.*, No. 8:04CV554, 2006 WL 176629, at *2 (D. Neb. 2006) (collecting cases in support of proposition that "the violation of a regulation adopted pursuant to § 1437d(k) is actionable under § 1983.").

Having established the legal framework for Anderson's § 1983 claims, I proceed to address each claim in turn.

### 1. Notice

*Goldberg* requires "timely and adequate notice detailing the reasons for a proposed termination . . . ." *Goldberg*, 397 U.S. at 267-68. 24 C.F.R. 982.555(c)(2) requires "prompt written notice" that the tenant may request a hearing that "(i)

Contain[s] a brief statement of reasons for the decision,
(ii) State[s] that if the family does not agree with the
decision, the family may request an informal hearing on the
decision, and (iii) State[s] the deadline for the family to
request an informal hearing." *Id.* § 982.555(c)(2).[4]  The
Defendants contend that as a matter of law, the notice that they
sent to Anderson met the requirements set out under both *Goldberg*
and 24 C.F.R. 982.555.

Citing *Edgecomb v. Housing Authority of Town of Vernon*, 824
F. Supp. 312, 314-315 (D. Conn. 1993), Anderson argues that the
notice is insufficient because it "merely parrots the broad
language of the regulation," failing to provide her with the
facts or details necessary for her to prepare a defense.
Anderson mischaracterizes the notice.  Instead of solely quoting
or paraphrasing the broad language of the regulation, the notice
recited the obligation that Anderson was alleged to have
violated, stated the relevant allegations (that her ex-boyfriend
and landlord, Brian Wenckus, had been residing at the apartment),
and additionally identified a source of the allegations (the
Lowell Police report dated May 12, 2010).  By contrast, in

---

[4] Although the Complaint cites a violation of "the
Plaintiff's right pursuant to 24 C.F.R. 982.555(a)(1)(v)," that
subsection of the regulation does not address the pre-hearing
notice.  I operate on the assumption that Anderson meant to rely
on 24 C.F.R. 982.555(c)(2), the regulation addressing notice.  To
the extent that Anderson seeks to rely on the identified
subsection, she fails to present a trialworthy issue.

*Edgecomb* the notice of termination was for "having engaged in drug-related criminal activity or violent criminal activity, including criminal activity by any family member" and failed to "indicate which family member committed proscribed acts, what the nature of the alleged crime was, or when the relevant acts were committed." *Edgecomb*, 824 F. Supp. at 315.  Unlike the notice in *Edgecomb*, the notice here "detail[s] the reasons for [the] proposed termination," *Goldberg*, 397 U.S. at 267-68, by identifying the relevant facts and rules.

Anderson also argues that a new notice was required after Maciejewski engaged in her investigation and consulted with staff about their impressions regarding the allegations.  Anderson contends that "Maciejewski's investigation of new facts should have warranted the issuance of a new notice stating additional grounds for which to prepare an adequate defense."  Although Anderson does not provide any case law supporting the proposition that a notice must include each and every source of evidence supporting the facts that will be alleged at a voucher termination hearing, a few decisions suggest that this might be a requirement.

In *Billington v. Underwood*, 613 F.2d 91 (5th Cir. 1980) (per curiam), the Fifth Circuit interpreted "the regulatory phrase 'informal hearing' . . . in light of decisions in other contexts specifying minimal procedures deemed necessary to promote the

accuracy of administrative agencies' factual
determinations . . . ." *Billington*, 613 F.2d at 93.  The Fifth
Circuit specifically cited *Robbins v. United States Railroad
Retirement Board*, 594 F.2d 448, 451-52 (5th Cir. 1979), which
"interpret[ed the] nonprecise 'fair hearing' provision of the
Railroad Unemployment Insurance Act, 45 U.S.C. § 355(c) (1976),
to require at least advance notice of the exact adverse
information upon which the government relied in making its
decision." *Id.* at 93-94.  The Fifth Circuit also discussed
"another federal regulation governing the housing authority
[that] requires it to document information relevant to the
acceptance or rejection of an applicant and to include in such
documentation '[a]s a minimum, . . . . the date, the source of
the information, including the name and title of the individual
contacted, and a resume of the information received." *Id.* at 94
(second and third alterations in original).  The Fifth Circuit
concluded that "equivalent detail in the statement of reasons
given [a] rejected [housing] applicant is required in order to
enable him to test the veracity of the agency's findings against
him." *Id.*

In *Edgecomb*, Judge Dorsey of the District of Connecticut
similarly cited *Robbins* and faulted a pre-termination notice
because it did not "provide notice of adverse evidence so that

[the tenants] would be able to rebut it." *Edgecomb*, 824 F. Supp. at 315.

In *Driver v. Housing Authority of Racine County*, 713 N.W.2d 670 (Wis. Ct. App. 2006), the Wisconsin Court of Appeals cited *Edgecomb* for the proposition that "the notice must alert the tenant to the nature of . . . adverse evidence" and cited *Billington* for the proposition that "in order to properly safeguard against error in eligibility determinations for section 8 benefits, the housing authority must at a minimum apprise the rejected applicant of the following information about the adverse evidence in its 'statement of reasons': the date, the source of the information--including the name and title of individuals contacted--and a resume of the information received." *Driver*, 713 N.W.2d at 676.

Similarly, in *Pratt v. Housing Authority for City of Camden*, Civil Action No. 05-0544 NLH, 2006 WL 2792784 (D.N.J. Sept. 27, 2006), Judge Hillman of the District of New Jersey cited *Edgecomb* for the proposition that a notice is deficient if it does "not indicate which family member committed the proscribed acts, what the nature of the alleged crime was, or when the relevant acts were committed, and it [does] not provide notice of adverse evidence so that [the tenants] would be able to rebut it." *Pratt*, 2006 WL 2792784, at *8. Judge Hillman cited *Billington* for the proposition that among various problems in a notice could

29

be the failure to provide the source of the information on which the termination decision was based.  *Id.* at *9.

The notices at issue in the above cases only repeated the general language of the regulations and were missing even the most basic of facts.  *See Billington*, 613 F.2d at 94; *Edgecomb*, 824 F. Supp. at 315; *Driver*, 713 N.W.2d at 674; *Pratt*, 2006 Wl 2792784, at *7.[5]  They failed to meet a much lower standard for pre-termination notice than the standard that Anderson proposes. I am unaware of any case finding a notice regarding the termination of housing benefits to be insufficient because of a failure to list every source of evidence to be presented at the hearing.

Moreover, there is reason to believe that the dicta in at least one of these opinions was not carefully considered.  In *Edgecomb*, despite the discussion of the failure to provide notice of adverse evidence, Judge Dorsey held that, where a termination was based on criminal activity, "[a] proper notice in compliance with the regulations would state the particular felony and the person who allegedly committed it, and would give a brief factual statement concerning the incident."  *Edgecomb*, 824 F. Supp. at 315.  He did not require a list of the witnesses or sources of

---

[5]  By contrast, here the relevant facts were in the notice of termination.  Charbonneau's observations of Anderson's relationship with Wenckus merely provided additional support for the fact asserted in the notice (and admitted by Anderson) that Wenckus was Anderson's ex-boyfriend.

the facts, but only a "brief factual statement" about the incident alleged.

I hold that neither due process nor 24 C.F.R. 982.555(c) requires a PHA to list on a pre-termination notice every source of evidence to be presented at the termination hearing where the notice adequately describes the alleged facts on which the proposed decision was based.

*Goldberg* requires a notice "detailing the reasons for a proposed termination," not a notice listing each piece of evidence and testimony expected at the hearing.  Elsewhere in *Goldberg*, the Court distinguishes between "reasons" for a decision and "evidence."  It states that "[t]o demonstrate compliance with [the requirement that a decision must be based on rules and evidence adduced at the hearing], the decision maker should state the reasons for his determination *and* indicate the evidence he relied on . . . ."  *Goldberg*, 397 U.S. at 271 (emphasis added).  The statement makes clear that "reasons" for a termination and the "evidence" on which those reasons are based are distinct categories of information.  *Goldberg* requires inclusion of only the former within a pre-termination notice.

This interpretation is in accord with the scope of the process due in the context of a pre-termination notice. "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors:

first, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Here, listing every source of evidence would impose a burden on the government with respect to pre-termination notices that is greater than that which the Federal Rules of Civil Procedure place on litigants with respect to complaints filed at federal courts.  Where the facts are alleged in the notice, listing the source of the information might occasionally be helpful, but more frequently such a listing would make no difference in the voucher recipient's preparation for the hearing.  In this case, for instance, I fail to see how the knowledge that Charbonneau would describe her observations of Wenckus and Anderson could have made any difference with respect to Anderson's preparation of rebuttal evidence.

Any argument that the notice was inadequate for failure to list the sources of evidence is even more attenuated from the language of the regulation than it is from the language of *Goldberg*.  24 C.F.R. 982.555(c) requires "a brief statement of

32

reasons for the decision . . . ."  A list of the sources of evidence to be presented at the hearing goes beyond the "reasons for the decision."  Such a list certainly undermines any expectation that the statement would be "brief."

There is no requirement that a pre-termination notice must list each source of evidence to be presented at the hearing. Consequently, I will grant judgment to the Defendants with respect to Count I.

### 2.  Impartial Hearing Officer

*Goldberg* holds that "an impartial decisionmaker is essential" and that the decisionmaker should not "have participated in making the determination under review." *Goldberg*, 397 U.S. at 271.  The related HUD regulations state that a pre-termination hearing "may be conducted by a person or persons designated by the PHA, other than a person who made or approved the decision under review or a subordinate of this person."  24 CFR § 982.555(e)(4)(i).

The Defendants contend that Maciejewski was an impartial decisionmaker as a matter of law because the original decision to terminate was made not by Maciejewski but by Chhan, the Director of Leased Housing and Maciejewski's subordinate.  Anderson raises two arguments in support of the proposition that Maciejewski was biased under the constitutional and/or regulatory standards.  I find neither argument convincing.

First, Anderson argues that Maciejewski "was the person who oversaw and managed the Leased Housing Division in a supervisory capacity and thus, was disqualified from being a hearing officer."  Neither due process nor 24 C.F.R. § 982.555(e)(4)(i) prohibits the supervisor of the original decisionmaker from serving as the decisionmaker at a subsequent termination hearing. To the extent that Anderson contends that Maciejewski must have approved the decision because she served as Chhan's supervisor, Anderson provides no evidence demonstrating that such an approval took place until after the hearing.

Second, Anderson argues that Maciejewski was a biased hearing officer because Maciejewski conducted a pre-hearing investigation by consulting with the LHA staff familiar with the grounds of Anderson's termination.  The HUD regulation does not address or prohibit such a pre-hearing investigation; it addresses only involvement with the original decision.  The requirements of procedural due process similarly do not preclude the PHA's use of a decisionmaker who has inquired about a matter prior to a hearing about the matter.

The Supreme Court has held that "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of [decisionmakers] at a later adversary hearing." *Withrow v. Larkin*, 421 U.S. 35, 55 (1975).  It observed that "[t]he case law, both federal and

34

state, generally rejects the idea that the combination [of]
judging [and] investigating functions is a denial of due
process." *Id.* at 52 (alterations in original).  The Supreme
Court stated that it "is not the case" that "the initial view of
the facts based on the evidence derived from nonadversarial
processes as a practice or legal matter foreclose[s] fair and
effective consideration at a subsequent adversary hearing leading
to ultimate decision . . . ." *Id.* at 58.

Here, Anderson points only to Maciejewski's pre-hearing
inquiries to demonstrate the decisionmaker's alleged bias.
Anderson does not offer any evidence that, as a matter of fact,
Maciejewski had made her decision prior to the hearing.  Anderson
does not demonstrate that Maciejewski had a financial interest in
the decision or personal animosity or other actual bias against
Anderson.  Consequently, Anderson has not shown that there is a
genuine dispute as to any fact material to Maciejewski's
impartiality. *See Hortonville Joint Sch. Dist. No. 1. v.
Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) ("Mere
familiarity with the facts of a case gained by an agency in the
performance of its statutory role does not, however, disqualify a
decisionmaker."); *Goldberg*, 397 U.S. at 271 ("[P]rior involvement
in some aspects of a case will not necessarily bar a welfare
official from acting as a decision maker."); *Pathak v. Dep't of
Veterans Affairs*, 274 F.3d 28, 33 (1st Cir. 2001) ("[T]he

combination of [investigatory and adjudicatory] functions does not alone violate due process."); *Brasslett v. Cota*, 761 F.2d 827, 837 (1st Cir. 1985) ("[A] decisionmaker who is involved in both investigative and adjudicative functions may not be presumed unconstitutionally biased.  Rather, a plaintiff alleging impartiality must overcome the presumption that administrators are men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances, and must demonstrate an actual risk of bias or prejudgment.") (internal citations and quotation marks omitted); *Gerritson v. Vance*, 488 F. Supp. 267, 269 (D. Mass. 1980) ("The attack on the 'fusion of functions' aspect of the procedures is similarly unsubstantiated, since the mere combination of investigative and adjudicative functions does not in itself violate due process.").

I will grant judgment to the Defendants with respect to Count II.

### 3.   First-Hand Witness

In Count III of her Complaint, Anderson asserts that "by conducting the Section 8 hearing without a first-hand witness of the incidents leading to the proposed termination," the Defendants violated Anderson's rights pursuant to the Due Process Clause and 24 C.F.R. 982.555(e)(5).  The cited regulation states:

> The PHA and the family must be given the opportunity to present evidence, and may question any witnesses. Evidence

36

may be considered without regard to admissibility under the
rules of evidence applicable to judicial proceedings.

There is no due process requirement or regulation that requires a

first-hand witness of the incidents leading to the proposed

termination where Anderson admitted at the hearing that Wenckus

resided at her apartment for longer than he was permitted and

that she knew this was against the rules.

Anderson states:

By investigating and soliciting witnesses who provided
testimony regarding their impressions of Ms. Anderson's
relationship with Brian Wenckus, the Lowell Housing
Authority forced Elizabeth Anderson to testify against
herself without having

Anderson does not complete the sentence, but she later contends:

The only recourse left to Ms. Maciejewski then was to
confront Ms. Anderson, in a room with three employees of the
Lowell Housing Authority present, demand she provide an
answer to an incident the Lowell Housing Authority could not
prove without such an admission and proceed with a
determination based on her own words.  The Lowell Housing
Authority did not have any evidence to present terminating
the Section 8 Voucher and instead[] created an environment
in which no other conclusion could be reached.

Anderson presents no evidence that she was forced to testify

against herself.  The LHA and Anderson were each given the

opportunity to present evidence.  Anderson, who was represented

by a lawyer, chose to testify at the hearing and she admitted

that she had broken the LHA rule with regard to unauthorized

occupants.  Her testimony was evidence that Maciejewski could

take into consideration in issuing the termination decision.

That there were three LHA employees present at the hearing does

not create a genuine dispute of material fact regarding whether Anderson was "forced" to testify.

Anderson also argues:

> Since the only evidence available to the Lowell Housing Authority on the date of the hearing were Ms. Anderson's statements and the impressions of a Lowell Housing Authority employee testifying on behalf of her supervisor, the Defendants relied on the Plaintiff[']s own admission as the basis for the termination.  However, before the court accepts this proposition, it should note that while administrative hearings are informal, the opportunity to cross examine and confront witnesses is essential when the information supplied by those witnesses serves as the basis for the loss of the benefit.  As such, denying a tenant such opportunity to confront such person is improper.

Anderson testified that she had housed an unauthorized occupant in her apartment.  That testimony did not prevent her from herself calling, confronting, or cross examining the LHA's witnesses.  The two issues seem to be entirely unrelated.

I will grant judgment to the Defendants with respect to Count III.

### 4.    Written Decision and Supporting Reasons

*Goldberg* holds that "the decisionmaker's conclusion as to the recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing." *Goldberg*, 397 U.S. at 271. The Supreme Court explained that "[t]o demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." *Id.*

(internal citation omitted).  The related HUD regulations state that "[t]he person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision.  Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing."  24 C.F.R. § 982.555(e)(6).

The Defendants contend that Maciejewski's letter summarizing the evidence presented at the hearing and providing the reason for her refusal to grant the reasonable accommodation request was sufficient to meet these requirements.  Anderson contends that the letter was inadequate on three grounds.  Anderson argues that the letter (1) "fails to provide any legal standard or reference for how a determination was made in accordance with the regulations and applicable case law," (2) did not refer to fact finding based on a preponderance of evidence, and (3) raised an additional ground that was not adduced at the hearing.

Anderson's first two contentions regarding the letter's alleged inadequacy are unconvincing.  The letter stated:

> The reason for termination was that you allowed your landlord, Brian Wenckus, to reside with you for a period of nine months while Ms. Wenckus was receiving rental assistance payments on [her] behalf . . . .  At the Hearing I indicated that under the Family Obligations of the Section 8 Voucher, you are not allowed to have unauthorized persons living with you.  You agreed that you understood this.

The letter clearly explains how the determination was made in accordance with the regulations.  To the extent that Anderson

contends that a particular paragraph number or other label for the rule must be identified, she cites no case law, and I am aware of none, supporting the proposition that such a citation is necessary.  Similarly, with respect to Anderson's contention that a decision must explicitly state that the fact-finding was based on a preponderance of evidence, Anderson does not support her arguments with citations to any regulations or case law.

*Goldberg* holds that the written decision "need not amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg*, 397 U.S. at 271.  The imposition of such technical rules as the requirements that the decisionmaker must specifically mention a rule number and must explicitly state the standard of proof is inconsistent with *Goldberg*'s refusal to require a full judicial opinion.  Such rules are also unnecessary to demonstrate that "the decisionmaker's conclusion as to the recipient's eligibility . . . rest[s] solely on the legal rules and evidence adduced at the hearing," *id.*, which is the purpose of the written decision according to *Goldberg*.  *See Lawrence v. Town of Brookhaven Dept. of Hous., Cmty. Dev. and Intergovernmental Affairs*, 07CV2243(JS)(WDW), 2007 WL 4591845, at *16 (E.D.N.Y. Dec. 26, 2007), *aff'd*, 393 F. App'x 791 (2d Cir. 2010) ("A requirement for a legalistic statement of evidentiary and legal grounds for the decision would add little of . . . benefit to the participant.  The character of the decision is not

40

more informative or comforting to the participant when stated as an enumeration of 'evidentiary' and 'legal' grounds.").

Anderson's third contention, however, raises significant issues precluding summary judgment for the Defendants and demonstrating that judgment should be granted for Anderson with respect to Count IV.  In her written decision, Maciejewski explicitly relied on research that she conducted *after* the hearing with respect to Anderson's car registration.  This evidence was not "adduced at the hearing," *id.*, and Anderson was never given a chance to respond to it.  *See Loving v. Brainerd Hous. and Redevelopment Auth.*, Civil No. 08-1349 JRT/RLE, 2009 WL 294289, at *7 (D. Minn. Feb. 5, 2009) ("If the hearing officer terminated plaintiffs' assistance on the basis of information supplied after the hearing, plaintiffs' due process rights may well have been violated.").

The evidence resulting from Maciejewski's post-hearing investigation regarding a purported Tewskbury car registration contributed to her determination that Anderson had engaged in a "clear pattern of deception which has been evident throughout this case" and to her termination of Anderson's benefits.  The Defendants provide no justification for Maciejewski's explicit reliance on this evidence in contravention of the principles of notice and opportunity to be heard that are fundamental to due

process.[6]   Nor do the Defendants provide any evidence to
contravene the fact--evident from the face of the written
decision--that Maciejewski relied on the information uncovered in
her post-hearing investigation.

Although Anderson has not moved for summary judgment, I
raised the possibility sua sponte at oral argument pursuant to
Federal Rule of Civil Procedure 56(f).   The Defendants did not
compellingly argue that summary judgment was not warranted and
did not request additional time to brief the issue.   Moreover,
the Defendants had a fair opportunity to consider the written
decision's compliance with the requirements of due process while
briefing their own motion for summary judgment.   *See Bank v.
International Business Machines Corp.*, 145 F.3d 420, 424 (1st
Cir. 1998) (allowing court's sua sponte entry of summary judgment
where party's "own motion for summary judgment had given it a
fair opportunity to put forward its own [argument]."").   The
Defendants were "afforded appropriate notice and a fair
opportunity to present [their] arguments" and "litigation [was]
sufficiently advanced that both parties have had a reasonable
opportunity to present any material evidence in their favor."
*Id.* at 431.   Consequently, I will deny judgment to the Defendants

---

[6]   At oral argument, Anderson's counsel stated that if
afforded the opportunity to explain, Anderson would testify that
on the advice of her colleagues at the District Attorney's office
she registered her vehicle to a friend's address in Tewksbury in
order to conceal her true address from her abusive ex-husband.

42

and grant judgment to Anderson with respect to Count IV.

### 5.   Arbitrary and Capricious Termination

In Count V, Anderson asserts that "the Defendants terminated [her] Section 8 Voucher in an arbitrary and capricious manner in violation of the Due Process Clause of the Fourteenth Amendment . . . ."  Under the arbitrary and capricious standard, "an agency's decision will be upheld unless the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors."  *P.R. Tel. Co., Inc., v. Telecomms. Regulatory Bd. of P.R.*, 665 F.3d 309, 319 (1st Cir. 2011) (quoting *Centennial P.R. License Corp. v. Telecomms. Regulatory Bd. Of P.R.*, 634 F.3d 17, 37 (1st Cir. 2011) (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009))) (internal quotation marks omitted). "Review under the arbitrary and capricious standard is narrow and this Court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions."  *Id.* (quoting *River St. Donuts*, 558 F.3d at 114).

Anderson contends that the LHA's decision was arbitrary and capricious for two reasons.

First, Anderson notes that a PHA "may consider all relevant circumstances," including "the effects of denial or termination of assistance on other family members who were not involved in the action or failure," in deciding whether to terminate Section

8 assistance.  24 C.F.R. § 982.552(c)(2)(i).  Anderson provides
no further argument explaining how this citation demonstrates
that the LHA acted arbitrarily and capriciously.  In particular,
Anderson points to no evidence in support of the proposition that
she presented special circumstances to the hearing officer
regarding the effects of termination of assistance on other
family members that went unconsidered.

Second, Anderson contends that "whether the decision was
arbitrary and capricious should be weighed against the
Defendants' conduct with regard to all pre-hearing investigations
by the judicial officer, Mary Ann Maciejewski."  Here, too,
Anderson fails to articulate a meaningful argument.  As I
discussed above, the mere combination of investigatory and
adjudicatory functions is insufficient ground to establish bias
in a decisionmaker.  *See supra* Part III.A.2.  Anderson does not
explain why Maciejewski's pre-hearing investigations would render
her later decision arbitrary and capricious.

I will grant judgment to the Defendants with respect to
Count V.

**B.   *Discrimination Claims***

In Counts VI and VII, Anderson asserts that the LHA violated
the federal FHA and Massachusetts G.L. c. 151B by (1) refusing to
provide her with a reasonable accommodation for her disability
and (2) making statements with respect to the rental of housing

44

that indicated a preference, limitation, or discrimination based
on handicap, or an intention to make such a preference,
limitation, or discrimination based on handicap.  Both the FHA
and G.L. c. 151B define a "handicap" as (1) a physical or mental
impairment that substantially limits one or more of a person's
major life activities, (2) a record of having such impairment, or
(3) being regarded as having such impairment.  42 U.S.C. § 3602
(defining "handicap" for purposes of the FHA); G.L. c. 151B,
§ 1(17) (employing almost identical language to define "handicap"
for purposes of G.L. c. 151B).  G.L. c. 151B defines "major life
activities" to mean "functions, including, but not limited to,
caring for one's self, performing manual tasks, walking, seeing,
hearing, speaking, breathing, learning and working."  G.L c.
151B, § 1(20).  The FHA provides no explicit definition of the
term.

Anderson stumbles at the threshold of her accommodation
claims because she fails to establish that she had a cognizable
handicap or disability at the relevant time and nothing in the
record demonstrates this to be a genuine issue of material fact.
Anderson testified that in 2009[7] it was difficult to focus and
she could not sit down to pay her bills because Wenckus was
"lurking around."  However, she stated that she did not miss work

---

[7]  In 2009 alone Wenckus stayed at Anderson's residence for
over two weeks, which was enough time to cause her to violate her
obligations under the LHA's Housing Choice Voucher Program.

due to her symptoms, got her work done, and that there was nothing else that she could not do.  She did not describe a substantial limit to any major life activity, and the record does not otherwise demonstrate that her impairment caused any such limitation rendering her impairment cognizable as a disability under the FHA or G.L. c. 151B.

The Defendants also move for summary judgment with respect to Anderson's claims of intentional discrimination--namely, that the LHA made, printed, or published statements with respect to housing that indicated a preference, limitation, or discrimination based on handicap, or an intention to make such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c) and G.L. c. 151B, § 4(7B).  The Defendants argue that "the record is devoid of a single fact that would support" this allegation of intentional discrimination.  Anderson does not respond.

I have not been directed to any statements made by the LHA or its agents in violation of 42 U.S.C. § 3604(c) or G.L. c. 151B, § 4(7B).  The LHA never stated that it was denying Anderson's request for a reasonable accommodation in a way that indicated a preference, limitation, or discrimination based on handicap.  The record provides no support for these claims.

Consequently, I will grant judgment to the Defendants with respect to Counts VI and VII.

## C.   Disposition of the Case

At oral argument, I asked the parties to identify what remedies might be appropriate here.  Anderson remains in her apartment and has only been paying Wenckus the equivalent of her portion of the rent under the Section 8 lease.  Wenckus apparently has not demanded the remainder of the rent.  Consequently, neither party was able to identify any ripe claim for damages due to the LHA's unlawful termination procedures.[8]

The parties agreed that, assuming a violation of Anderson's due process rights and a continued intent on the part of the Lowell Housing Authority to pursue termination, a new hearing would be required.  "Only wip[ing] the slate clean . . . [will] restore [Anderson] to the position [she] would have occupied had due process of law been accorded to [her] in the first place." *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 87 (1988) (internal quotation marks omitted).  I will remand for the LHA to provide such a hearing if necessary.

The remainder of the claims in this case--those against Wenckus--sound in state law.  I decline to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3) and will remand them to the Northeast Division of the Massachusetts Housing Court Department.  *See Long v. Bando Mfg.*

---

[8]   Because damages are not in issue, I need not consider the qualified immunity defense raised by the individual Lowell Housing Authority Defendants in their personal capacities.

47

*of America, Inc.*, 201 F.3d 754, 761 (6th Cir. 2000) (holding that district court has discretion to remand remaining state-law claims in removed case after granting summary judgment with respect to claim that was the basis for federal jurisdiction); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (holding same); *Exec. Software N. Am., Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 24 F.3d 1545, 1551 (9th Cir. 1994) (stating same); *Decatur Memorial Hosp. v. Conn. Gen. Life Ins. Co.*, 990 F.2d 925, 927-28 (7th Cir. 1993) (stating same).

## IV.   CONCLUSION

For the reasons set forth above, I:

1.   GRANT in part and DENY in part the Defendants' Motion for Summary Judgment (Dkt. No. 15).  Specifically, I DENY summary judgment only with respect to Count IV and instead GRANT summary judgment to the Plaintiff with respect to Count IV;

2.   ORDER the Defendants to conduct a new termination hearing before a hearing officer who is not a defendant in this action, if the Defendants chose to pursue the termination of the Plaintiff's Section 8 voucher; and

3.   REMAND Counts VIII-XI to the Massachusetts Housing Court Department, Northeast Division.

> */s/ Douglas P. Woodlock*
> DOUGLAS P. WOODLOCK
> UNITED STATES DISTRICT JUDGE